UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                                      :
MEMORYTEN, INC.,                                      :
                                                      :
                                      Plaintiff,      :          14 Civ. 635 (KPF)
                                                      :
                        v.                            :          OPINION AND ORDER
                                                      :
SILICON MOUNTAIN HOLDINGS, *et al.*,                  :
                                                      :
                                      Defendants.     :
                                                      :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 16, 2015

KATHERINE POLK FAILLA, District Judge:

Plaintiff MemoryTen, Inc. ("MemoryTen") brought this action against Defendants Silicon Mountain Holdings, Inc. ("Silicon"), Silicon Mountain Memory ("SMM"), WayTech, LLC ("WayTech"), and the LV Defendants (defined *infra*). After proceeding for several years in the United States District Court for the District of Colorado, the case was transferred to this District. Plaintiff alleges breach of contract, unfair competition, and unjust enrichment — under theories of direct liability, alter-ego liability, and agency liability — and seeks damages and declaratory and injunctive relief. The LV Defendants move for summary judgment on all claims, and WayTech moves to dismiss the Complaint for failure to state a claim upon which relief can be granted. For the reasons set forth in this Opinion, both motions are granted.

## BACKGROUND[1]

**A.  Factual Background**

**1.  The Parties**

This case arises from a series of transactions involving Silicon, a Colorado corporation that is involved in the sale of computer memory products. In 2007, Silicon acquired all outstanding and issued stock of a predecessor corporation, SMM, and its subsidiary, VCI Systems, Inc.  (LV Def. 56.1 ¶ 14). As part of this transaction, Silicon also acquired the outstanding debt of SMM to certain of the LV Defendants; thereafter, it entered into a separate agreement with the LV Defendants that is described in more detail below.  (*Id.*).

The LV Defendants are a group of five companies that operate in tandem. (Compl. ¶ 9).  The four investment companies beneath this umbrella are Laurus Master Fund, Ltd., a Cayman Islands corporation (*id.* at ¶ 5); Laurus

---

[1]     The facts in this Opinion are drawn from the LV Defendants' Local Rule 56.1 Statement ("LV Def. 56.1") (Dkt. #208); Plaintiff's response to the LV Defendants' Local Rule 56.1 Statement ("Pl. 56.1 Response") (Dkt. #212); Plaintiff's Local Rule 56.1 Statement ("Pl. 56.1") (Dkt. #211); the LV Defendants' response to Plaintiffs' Local Rule 56.1 Statement ("LV Def. 56.1 Response") (Dkt. #222); and the declarations and affidavits (cited as "[Name] Decl.") and exhibits thereto submitted with the parties' briefs.  Where appropriate, the Court has adopted the naming and capitalization conventions used by the parties.  Citations to a party's Local Rule 56.1 Statement incorporate by reference the documents and deposition testimony cited therein.  Where cited directly, deposition testimony is cited as "[Name] Dep."  The parties' memoranda of law submitted in connection with the LV Defendants' motion for summary judgment are cited as "LV Def. Br."; "Pl. SJ Opp."; and "LV Def. Reply."

With regard to Defendant WayTech's motion to dismiss, the facts are drawn from Plaintiff's Second Amended Complaint (the "Complaint" or "Compl.") (Dkt. #125), and are taken as true for purposes of the pending motion to dismiss.  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (when reviewing a complaint for failure to state a claim, the court will "assume all well-pleaded factual allegations to be true" (internal quotation marks omitted)).  The Court also considers "documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).  The parties' memoranda of law submitted in connection with WayTech's motion to dismiss are cited as "WayTech Def. Br.," "Pl. MTD Opp.," and "WayTech Def. Reply."

Capital Management, LLC, a private investment adviser incorporated in Delaware that provides investment management for Laurus Master Fund (*id.* at ¶ 6); Valens Capital Management, LLC, a private investment adviser incorporated in Delaware (*id.* at ¶ 7); and Valens Investment Advisers, L.P., a limited partnership organized under the laws of Delaware (*id.* at ¶ 8).  LV Administrative Services, Inc. is a Delaware corporation that acts as the administrative and collateral agent to the other four companies.  (*Id.* at ¶ 4). All five companies are engaged in the same business, have the same ownership and management, and operate out of the same New York office.  (*Id.* at ¶ 9).

Defendant WayTech is a Missouri limited liability company "in the business of selling computer equipment, software, and parts."  (Compl. ¶ 14). In 2011, WayTech purchased Silicon from the LV Defendants.

Plaintiff MemoryTen, a California corporation, "is a manufacturer, distributor and reseller of various computer components/modules, both domestically and internationally."  (Compl. ¶ 3).

**2.      The LV Defendants' Loans to Silicon**

On September 25, 2006, SMM entered into a "Security and Purchase Agreement" (Regan Decl. Ex. 2), by which a subset of the LV Defendants agreed to loan up to $8.5 million to SMM.  (LV Def. 56.1 ¶ 14(a)).  The Security and Purchase Agreement, among its other terms, granted the LV Defendants a first priority lien upon all of the assets of SMM.  (Security and Purchase Agreement § 6(a)).

On August 28, 2007, Silicon acquired all issued and outstanding stock of SMM. (LV Def. 56.1 ¶ 14(b)). In connection with this transaction, Silicon entered into a Master Security Agreement, Joinder Agreement, and Guaranty (collectively, with the Security and Purchase Agreement, the "Loan Documents") with the LV Defendants. (*Id.*). The Master Security Agreement (Regan Decl. Ex. 3), which is governed by New York law (*id.* at ¶ 10), similarly granted the LV Defendants a first priority lien and security interest in all of the assets of Silicon (*id.* at ¶ 1). The Master Security Agreement provided that Silicon would "not, without the Purchasers' prior written consent, sell, exchange, lease or otherwise dispose of any Collateral" (*id.* at ¶ 3(g)), and that it would as well "keep its Collateral free and clear of all … encumbrances of any kind and nature," except for certain limited (and not relevant) exceptions (*id.* at ¶ 3(e)). It further provided that, in an Event of Default, the LV Defendants would have the remedies available to a secured party under the Uniform Commercial Code (the "UCC") in effect in New York (*id.* at ¶ 5).[2] As part of these transactions, the LV Defendants also gained substantial common stock (though never exceeding 9.99% of Silicon's total outstanding stock (Regan Decl. ¶ 8)), along with warrants to obtain additional common stock that were not exercised (LV Def. 56.1 Response ¶ 1).

---

[2]     An Event of Default was defined to include, among other events, a material breach of the Master Security Agreement or any Event of Default so defined under the Security and Purchase Agreement. (LV Def. 56.1 ¶ 4).

### 3.     The Subscription Agreement

Beginning in or around 2007, Silicon began purchasing products for resale from MemoryTen.  (Pl. 56.1 ¶ 6).  Silicon initially incurred an unpaid balance of $89,284, in satisfaction of which it gave MemoryTen 89,284 shares of common stock.  (*Id.*).  Through 2008, Silicon continued to purchase products from MemoryTen, incurring by August 2008 an unpaid balance of $500,000.  (*Id.* at ¶ 8).  Silicon and MemoryTen entered into discussions over how to settle this debt, eventually arriving at the Subscription Agreement (Olsen Decl. Ex. A), which was signed on August 12, 2008.[3]

The Subscription Agreement provided MemoryTen with two primary benefits.  First, MemoryTen received $500,000 worth of common stock.  (Subscription Agreement ¶¶ 1.1, 1.2, 2.1).[4]  Second — and more significantly for the purposes of this litigation — the Subscription Agreement provided MemoryTen a first option and right to acquire Silicon's Memory Component Distribution Business (the "Distribution Business") under certain circumstances.  (*Id.* at ¶¶ 8.1-8.4).

Under Paragraph 8.1, "[s]ubject to the rights of" the LV Defendants under the Loan Documents, MemoryTen would have "the first option and right to acquire all of the shares in [Silicon] from [Silicon] at a price mutually agreed

---

[3]     The Subscription Agreement appears to contemplate written memorializations of certain other agreements in principle (*see* Subscription Agreement Recitals), but there is no evidence that such additional agreements were executed (*see* LV Def. 56.1 Response ¶ 9).

[4]     The Subscription Agreement (as well as the parties' briefing) refers to the constituent provisions of that document interchangeably as "sections" and "paragraphs."  For consistency, the Court refers to them as paragraphs.

upon by the parties by the process outlined in Paragraph 8.4." (Subscription Agreement ¶ 8.1). These rights would be triggered if Silicon entered into a "Corporate Transaction" (defined as an acquisition, sale, or transfer of Silicon or substantially all of its assets), for an amount less than $6 million, pursuant to the approval of Silicon's Board of Directors and stockholders holding at least 50% of its voting stock. (*Id*.). Paragraph 8.1 further provided that the LV Defendants would not "unreasonably withhold consent or approval, and [would] not unreasonably withhold any related waiver, under the [Loan] Documents." (*Id*.).

Under Paragraph 8.2, again "[s]ubject to the rights of" the LV Defendants under the Loan Documents, MemoryTen would have the first option and right to acquire the Distribution Business if Silicon were to offer it for sale. (Subscription Agreement ¶ 8.2). The sale would take place "at a price mutually agreed upon by the parties hereto by the process outlined in Paragraph 8.4," and again the LV Defendants would not "unreasonably withhold consent or approval, and [would] not unreasonably withhold any related waiver, under the [Loan] Documents." (*Id*.).

Paragraph 8.4, again still "[s]ubject to the rights of" the LV Defendants under the Loan Documents, defined the Distribution Business and set forth three possible procedures by which the parties would arrive at a sale price for it. (Subscription Agreement ¶ 8.4). The price would be the highest of (i) the fair market value of the Distribution Business as determined by a third party; (ii) the highest and best offer selected as the winning bid or offer in a

6

bankruptcy proceeding; or (iii) "the price mutually agreed to by the parties hereto and the [LV Defendants], and on other terms and conditions mutually agreed to by the parties hereto and the [LV Defendants] in good faith." (*Id.* at ¶ 8.4(i)-(iii)).

The Subscription Agreement, which is governed by Colorado law (Subscription Agreement ¶ 10), additionally contained an integration clause stating that "[t]his Agreement constitutes the entire agreement and supersedes all prior agreements and understandings, both written and oral, among the parties hereto with respect to the subject matter hereof." (*Id.* at ¶ 12). It identified the LV Defendants as a third-party beneficiary (*id.* at ¶ 14), and was signed by MemoryTen, Silicon, and the LV Defendants.

Shortly after the Subscription Agreement was signed, during negotiations over a subsequent agreement, the LV Defendants stated in an email correspondence their understanding of the interplay between the Subscription Agreement and the Master Security Agreement:

> Laurus will not provide a Waiver for any deal that allows MemoryTen to exercise [the purchase] option in an Event of Default as that would effectively give MemoryTen a first priority lien over all the assets of the Memory Components Division. From our perspective, in an Event of Default, MemoryTen would have the option but not the obligation to purchase the Memory Components Division for $5 million. If it doesn't believe that to be a worthwhile price then it can choose not to exercise that option and pursue other options.

(Kripalani Decl. Ex. A). MemoryTen's chief executive has declared in this litigation that it was his understanding that MemoryTen's option to acquire the Distribution Business would not be eliminated by a foreclosure on Silicon by

the LV Defendants and a consequent sale of its assets pursuant to the latters'
rights under the UCC.  (Olsen Decl. ¶¶ 8-10).

**B.      The LV Defendants' Foreclosure on Silicon and the Sale to WayTech**

Between the signing of the Security and Purchase Agreement in
September 2006 and August 2008, the LV Defendants repeatedly granted
advances to SMM and Silicon, deferred payments, and amended the
agreements governing Silicon's debt; notwithstanding these facts, the LV
Defendants maintain that an Event of Default never technically occurred
during this period.  (Hrafnkelsdottir Dep. 16-17, 116-17).  To the contrary, the
LV Defendants sent Silicon an email stating that Silicon was not technically in
default on August 14, 2008, two days after the Subscription Agreement was
entered into.  (Jacobs Decl. Ex. B).  Plaintiff maintains, supported by the
declaration of Silicon's former Chief Operating Officer during the relevant
period, that Silicon was in default and merely had not received a formal notice
of such default.  (*See* Hanner Decl. ¶ 11).  Moreover, according to MemoryTen,
over the course of this period the LV Defendants came to exercise effective
control over the business operations of Silicon.  (*Id.* at ¶¶ 4-10).  The LV
Defendants deny that such close control existed.

In December 2008, the LV Defendants and Silicon began to discuss the
potential sale of Silicon's Distribution Business, entering into discussions with
MemoryTen and at least one other potential buyer.  (Pl. 56.1 ¶ 26).  Such
discussions actively continued through at least April 2009.  (*Id.* at ¶¶ 27-28).
On December 14, 2010, the LV Defendants sent a Notice of Default to Silicon.

8

(LV Def. 56.1 ¶ 19).  This notice was followed by a "peaceful possession" letter on January 14, 2011.  (Pl. 56.1 ¶ 31).  After taking possession of Silicon, the LV Defendants continued negotiations with MemoryTen for the sale of Silicon, while also negotiating with WayTech.  (*Id.* at ¶ 32).  In March 2011, MemoryTen and WayTech made competing offers of $400,000 and $432,000, respectively, for Silicon; in April 2011, the LV Defendants accepted WayTech's offer and sold Silicon.  (*Id.* at ¶¶ 33-36).

## C.    Procedural Background

On April 13, 2012, MemoryTen filed suit against the LV Defendants and Silicon in the United States District Court for the District of Colorado.  (Dkt #1).  On December 20, 2012, MemoryTen filed its First Amended Complaint against the same Defendants, plus SMM and "Way Technology, LLC."  (Dkt. #98).  On March 5, 2013, MemoryTen filed its Second Amended Complaint against the LV Defendants, Silicon, SMM, and WayTech.  (Dkt. #125).  Several motions to dismiss the claims, to dismiss counterclaims, and for summary judgment were filed over this period and affected by the various amendments.  Ultimately considered by the Colorado District Court were the LV Defendants' motion for summary judgment and WayTech's motion to dismiss for failure to state a claim.  The Court initially granted WayTech's motion to dismiss on April 30, 2013.  (Dkt. #163).  However, on January 29, 2014, the Court granted Plaintiff's motion for relief from the April 30, 2013 order and transfer to the Southern District of New York.  (Dkt. #176).  On January 31, 2014, the case

was transferred to the Southern District of New York and assigned to the undersigned.  (Dkt. #177).

On August 7, 2014, WayTech filed its motion to dismiss for failure to state a claim (Dkt. #203), and on August 8, 2014, the LV Defendants filed a motion for summary judgment (Dkt. #207).  On September 9, 2014, MemoryTen filed its response to the motion for summary judgment (Dkt. #210), and on September 10, 2014, its response to the motion to dismiss (Dkt. #214).  The briefing was complete upon the filing of WayTech's reply on September 23, 2014 (Dkt. #218), and the LV Defendants' reply on September 30, 2014 (Dkt. #221).[5]

## DISCUSSION

### A.    The LV Defendants' Motion for Summary Judgment Is Granted

#### 1.    Applicable Law

Under Federal Rule of Civil Procedure 56(c), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986) (quoting previous version of Fed. R. Civ. P. 56(c)); *see also Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the

---

[5]     Plaintiff points out that the scheduling orders issued by the Court spoke only of the LV Defendants' summary judgment motion and did not provide for WayTech's motion to dismiss.  (Pl. MTD Opp. 2).  The Court will not, however, penalize WayTech for the imprecision of its own orders, particularly since counsel for WayTech indicated at the April 24, 2014 pre-motion conference that it contemplated filing a motion to dismiss in tandem with the LV Defendants' motion for summary judgment.  (Apr. 24, 2014 Tr. 20-21).

initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings.  *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a

11

motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). Furthermore, "[m]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks and citations omitted).

### 2.   Analysis

#### a.   Plaintiff's Right to Acquire Under the Subscription Agreement Was Negated by the LV Defendants' Exercise of Their Article 9 Rights

The parties agree that the LV Defendants were within their rights, as secured creditors under Article 9 of the UCC, to take possession of the assets identified as collateral by the Loan Documents, including Silicon and its Distribution Business. (*See* Kripalani Tr. 117). Further, MemoryTen does not challenge the general proposition that a secured creditor, upon taking possession of collateral, is entitled to sell it in satisfaction of an obligation under Article 9. (*See* Dkt. #192 (Transcript of April 24, 2014 Hearing) at 8). Instead, the parties' dispute centers on the effect, if any, that the Subscription Agreement had upon the LV Defendants' rights as conferred by the Loan Documents. This requires the Court to examine the meaning of Paragraphs 8.1, 8.2, and 8.4 of the Subscription Agreement — and, more particularly, the clause in each paragraph according rights to MemoryTen "subject to" the LV Defendants' rights under the Loan Documents. The LV Defendants argue that the phrase "subject to" means that MemoryTen's purchase rights are entirely subservient to those of the LV Defendants under the Loan Documents, and

thus are eliminated by the exercise of those Article 9 rights.  (LV Def. Br. 4-8; LV Def. Reply 1-2).  MemoryTen argues that, in context, the phrase should be interpreted as "consistent with," so that MemoryTen's rights cannot impair the LV Defendants' right to seize the collateral, but the LV Defendants correspondingly cannot exercise their resulting sale rights in a manner inconsistent with MemoryTen's right to acquire Silicon or the Distribution Business.  (Pl. SJ Opp. 3-6, 8-10).

Under Colorado law, which governs the Subscription Agreement, a court's "primary aim in contract interpretation is to ascertain and implement the intent of the parties."  *Fed. Deposit Ins. Corp.* v. *Fisher*, 292 P.3d 934, 937 (Colo. 2013).  In interpreting the language of a deed — and noting throughout that the principles of contract interpretation applied — the Colorado Supreme Court stated that "the weight and momentum of authority is behind the more flexible approach to [interpretation]," under which approach "extrinsic evidence is used to explain and give context to the language."  *Lazy Dog Ranch* v. *Telluray Ranch Corp.*, 965 P.2d 1229, 1236-37 (Colo. 1998), *as modified on denial of reh'g* (Oct. 19, 1998).  The Court approvingly quoted the Restatement (Second) of Contracts, which noted that "[i]t is sometimes said that extrinsic evidence cannot change the plain meaning of a writing, but meaning can almost never be plain except in context."  *Id.* at 1237 n.7 (quoting Restatement (Second) of Contracts § 212 cmt. b).  It has elsewhere stated:

> [a]lthough we have noted that in construing contracts, as distinguished from statutes or rules having general applicability, it may be appropriate to look beyond the

"four corners" of the document and consider context and surrounding circumstances, not only for resolving ambiguity but even for determining whether it exists, we have always made clear that extrinsic evidence of intent can never contradict or change the language of a contract or justify an interpretation not reasonably derivable from the contract itself.

*Fort Lyon Canal Co.* v. *High Plains A & M, LLC*, 167 P.3d 726, 729 (Colo. 2007). Thus this Court, in interpreting the Subscription Agreement, looks to both the text of the contract and the extrinsic evidence in determining whether there is ambiguity, while ensuring that the unambiguous meaning of the text not be overcome by ambiguous extrinsic evidence.

Ordinarily the phrase "subject to" is defined as "liable, subordinate, subservient, inferior, obedient to; governed by or affected by; provided that; provided; answerable for." *Black's Law Dictionary* 1425 (6th ed. 1990). Plaintiff, however, argues that Paragraphs 8.1 and 8.2 — stating that Silicon's ability to sell the distribution and MemoryTen's ensuing right to acquire are "subject to" the LV Defendants' Article 9 rights — must be read to state that, whatever the rights exercised by the LV Defendants, MemoryTen's right to acquire persists through to the Article 9 sale.  In effect, MemoryTen would make subordinate the provisions of the Loan Documents, and make superordinate the provisions of the Subscription Agreement.  In doing so, MemoryTen would turn the meaning of the phrase "subject to" precisely on its head, reading it to mean "notwithstanding."  Yet as noted by *Garner's Dictionary of Legal Usage*, those two phrases are antitheses: "notwithstanding" is used "to introduce a superordinate provision," while "subject to" is used "to

14

introduce a subordinate provision." *Garner's Dictionary of Legal Usage* 616 (3d ed. 2011); *cf. also Hellenic Lines, Ltd.* v. *Embassy of Pak.*, 467 F.2d 1150, 1155 (2d Cir. 1972) ("The phrase 'subject to' indicates that the terms of the bill of lading were subordinate to the terms of the respective freight contracts."); *Swan Magnetics, Inc.* v. *Superior Court*, 56 Cal. App. 4th 1504, 1510 (Cal. Ct. App. 1997), *as modified* (Sept. 12, 1997) ("The phrase 'subject to' is not synonymous with 'according to' or 'consistent with'; it means conditioned upon, limited by, or subordinate to.").

Within the four corners of the text, then, there is no ambiguity to be found; MemoryTen's preferred interpretation is simply the opposite of what the text plainly states. Pursuant to the Colorado precedent discussed above, however, the Court considers the contextual and extrinsic evidence that MemoryTen argues supports its interpretation, or at least evinces ambiguity.

First, MemoryTen argues that the LV Defendants demonstrated an intent to be constrained in their exercise of their Article 9 rights merely by signing onto the contract: given that their Article 9 rights were otherwise unconstrained, why else sign? (*See* Pl. SJ Opp. 4-5). The answer is simple. The LV Defendants' accession was a necessary precondition to MemoryTen's ability to acquire any option in any portion of Silicon. The Loan Documents forbade Silicon from encumbering or disposing of the collateral without the LV Defendants' consent (*see* Master Security Agreement ¶¶ 4(e), 4(g)); thus, because an option is a form of encumbrance, without the LV Defendants' consent Paragraphs 8.1 and 8.2 of the Subscription Agreement would have

been presumptively invalid.  In short, the Court finds that the LV Defendants signed the Subscription Agreement to enforce their rights rather than waive them.

Second, MemoryTen argues that the transaction as a whole is commercially unreasonable under the LV Defendants' interpretation: MemoryTen would not have paid for an option that could be nullified at any time by the LV Defendants, given that Silicon was already in default under the Loan Documents.  (*See* Pl. SJ Opp. 5, 10-11).[6]  It is true that under Colorado law courts "must construe the terms of the agreement in a manner that allows each party to receive the benefit of the bargain, and the scope of the agreement must faithfully reflect the reasonable expectations of the parties."  *Allen* v. *Pacheco*, 71 P.3d 375, 378 (Colo. 2003).  But MemoryTen has not shown either that the terms of the contract deprive it of the benefit of the bargain or that the unambiguous language does not reflect the parties' intent.[7]  MemoryTen settled

---

[6]   The Court accepts, as it must due to the procedural posture, MemoryTen's contested assertion that Silicon was in fact in default in August 2008.

[7]   To the extent MemoryTen argues that the contract is unconscionable, that argument is equally foreclosed.  Under Colorado law, a party asserting that a contract is unconscionable must prove "both procedural and substantive unconscionability," looking to a number of factors including:

> (1) the use of a standardized agreement executed by parties of unequal bargaining power; (2) the lack of an opportunity for the customer to read or become familiar with the document before signing it; (3) the use of fine print in the portion of the contract containing the provision in question; (4) the absence of evidence that the provision was commercially reasonable or should reasonably have been anticipated; (5) the terms of the contract, including substantive fairness; (6) the relationship of the parties, including factors of assent, unfair surprise, and notice; and (7) the circumstances surrounding the formation of the contract, including setting, purpose, and effect.

16

a $500,000 debt for common stock worth that amount and an option exercisable only under certain circumstances; particularly given MemoryTen's argument that Silicon was already in default to the LV Defendants, this may well have been the best deal that it could hope for. All contracts have winners and losers, and all conditional option contracts have the potential to go unexercised. The fact that MemoryTen did not get all that it hoped to from the contract does not mean that it was wrongly deprived of any benefit for which it bargained.

Third, Plaintiff provides an email sent on October 13, 2008 — two months after the Subscription Agreement was signed — from an officer of the LV Defendants to an officer of MemoryTen during discussions over a subsequent Credit Agreement. (*See* Pl. SJ Opp. 13-14 (citing Kripalani Decl. Ex. 1)). In the email, Jay Drezner of the LV Defendants notes that the language of the proposed Credit Agreement does not match that of the Subscription Agreement with regard to MemoryTen's right to purchase Silicon in the event it sells itself or sells the Distribution Business. (Kripalani Decl. Ex. 1). He then states:

---

*Nesbitt* v. *FCNH, Inc.*, No. 14 Civ. 990 (RBJ), 2014 WL 6477636, at *3 (D. Colo. Nov. 19, 2014). MemoryTen has not shown the sort of inequality of bargaining power or deceptiveness necessary to showing of procedural unconscionability. *See id.* (looking at the first, second, third, sixth, and seventh factors to determine procedural unconscionability). And while the contract worked out to MemoryTen's disadvantage, it has not shown that the settling of a $500,000 debt for common stock worth that amount and an option exercisable only under certain circumstances amounts to the sort of severe imbalance that amounts to substantive unconscionability, and thus cannot be countenanced by courts. *See Bailey* v. *Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1056 (Colo. 2011) (citing, for the standard for substantive unconscionability, *Tillman* v. *Commercial Credit Loans, Inc.*, 362 N.C. 93, 103 (2008) ("Substantive unconscionability, on the other hand, refers to harsh, one-sided, and oppressive contract terms.")).

17

> To be clear, however, Laurus will not provide a Waiver
> for any deal that allows MemoryTen to exercise that
> option in an Event of Default as that would effectively
> give MemoryTen a first priority lien over all the assets of
> the Memory Components Division. *From our
> perspective, in an Event of Default, MemoryTen would
> have the option but not the obligation to purchase the
> Memory Components Division for $5 million.* If it doesn't
> believe that to be a worthwhile price then it can choose
> not to exercise that option and pursue other options.

(*Id.* (emphasis added)).  MemoryTen argues that the italicized language clearly

demonstrates the LV Defendants' understanding that MemoryTen's right to

acquire the Distribution Business persists through a default under the Loan

Documents.

It is true that post-drafting correspondence between the parties can shed

light on a contract's interpretation.  *See Ocean Transp. Line, Inc.* v. *Am.*

*Philippine Fiber Indus., Inc.*, 743 F.2d 85, 90 (2d Cir. 1984) (looking to "a series

of memoranda and correspondence exchanged" after the drafting of the

contract).  Yet MemoryTen's reading of this correspondence is highly cramped.

It entirely ignores the first sentence, which appears to reject precisely the

reading that MemoryTen urges upon the Court.  While MemoryTen does not

provide the full context of the email, it appears that Drezner is rejecting an

interpretation proposed by MemoryTen that would allow MemoryTen's rights

under the Subscription Agreement to persist through default, and in effect

"give MemoryTen a first priority lien over all the assets of the" Distribution

Business.  (Kripalani Decl. Ex. 1).  In addition, MemoryTen ignores the

colloquial use of "option" in the final sentence (i.e., MemoryTen can "pursue

other options"), which raises the question of whether the "option" referred to in

18

the second sentence is a legal right or simply a choice being offered by the LV Defendants. (*Id.*). The second sentence, in context, is thus better read as the LV Defendants' expressing a willingness to sell the Distribution Business even in the event of Silicon's default, while still rejecting MemoryTen's assertion of an irrevocable legal right to acquire the business. This interpretation is also consistent with what actually happened: after foreclosing on Silicon, the LV Defendants negotiated with MemoryTen as well as WayTech for the sale of the Distribution Business.

Even after reviewing MemoryTen's proffered extrinsic evidence, the Court concludes that the interaction of the Subscription Agreement and the Loan Documents is not ambiguous. The phrase "subject to" meant that MemoryTen's right to acquire was at all times subordinate to the LV Defendants' right to foreclose in the event of default and freely sell Silicon or its assets without being bound to a single buyer. The evidence offered by MemoryTen may suggest that its entry into this contract ultimately proved unwise, but the evidence does not suggest that the Subscription Agreement's language is ambiguous.

### 2.     Plaintiff's Claims Against the LV Defendants Fail

With a proper understanding of the Subscription Agreement's terms, the Court can now turn to Plaintiff's claims for relief against the LV Defendants: breach of contract, unfair competition, unjust enrichment, alter-ego liability, and declaratory relief. Two of these claims — unfair competition and unjust

enrichment — are abandoned in MemoryTen's brief in opposition.[8]  MemoryTen essentially proceeds on a theory that the LV Defendants breached the Subscription Agreement either directly, or by acting as the agents or alter egos of Silicon.  So framed, the viability of these claims hinges upon a showing that *any* of the parties — whether the LV Defendants or Silicon — breached the Subscription Agreement.

MemoryTen's first argument is that a "triggering event" under paragraph 8.1 of the Subscription Agreement occurred, either when Silicon surrendered its assets for peaceful possession by the LV Defendants or when the LV Defendants took such possession.  (Pl. SJ Opp. 15).  The text of the Subscription Agreement does not bear out either of these arguments.  Although Paragraph 8.1 applies to a "Corporate Transaction," and although the foreclosure by the LV Defendants could be construed to satisfy its definition of Corporate Transaction, Paragraph 8.1 further specifies that it is only triggered "if the Board of Directors of the Corporation and the stockholders representing more than fifty percent (50%) of the then issued voting stock of the Corporation approve of a proposed Corporate Transaction."  (Subscription Agreement ¶ 8.1).

---

[8]     As the Second Circuit has remarked, "a partial opposition [to a motion for summary judgment] may imply an abandonment of some claims or defenses.  Generally … a partial response reflects a decision by a party's attorney to pursue some claims … and to abandon others."  *Jackson* v. *Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014).  In such a case, where "abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole, district courts may conclude that abandonment was intended."  *Id.*  Here, the LV Defendants spend a significant portion of their brief in support of summary judgment demonstrating that MemoryTen fails to state a claim for unfair competition or unjust enrichment.  (*See* LV Def. Br. 18-21).  The Court thus infers from the fact that MemoryTen makes no defense of these claims in its brief in opposition to summary judgment that it has abandoned these claims.

There is nothing in the record to suggest that these requirements were met in the course of the LV Defendants exercising their contractual rights.

MemoryTen also looks to Paragraph 8.2, in which its right to acquire the Distribution Business is triggered "in the event [Silicon] proposes to offer the Memory Component Distribution Business … for sale or transfer in a transaction." (Pl. SJ Opp. 15-17 (citing Subscription Agreement ¶ 8.2)). MemoryTen first argues that Silicon did, in fact, propose to offer the Distribution Business for sale when it and the LV Defendants entered into negotiations with MemoryTen and others from December 2008 to January 2010. MemoryTen puts forward evidence of serious negotiations during this period, but such negotiations do not meet the requirements of Paragraph 8.2. Under Colorado law, "[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Sumerel* v. *Goodyear Tire & Rubber Co.*, 232 P.3d 128, 133 (Colo. App. 2009) (quoting Restatement (Second) of Contracts § 24 (2008)). A proposal, meanwhile, is defined as "[t]he act of putting something forward for consideration." *Black's Law Dictionary* 1413 (10th ed. 2014). Putting these two terms together, to "propose to offer" something is "to put an offer forward for consideration." This would suggest that, to trigger Paragraph 8.2, negotiations cannot merely have been begun, but have arrived at the point at which a formal offer — sufficiently complete to be capable of binding the offeror by the offeree's acceptance — is ready to be

made; at that point, the same formal offer to be given to the third party must first be given to MemoryTen.

This reading of Paragraph 8.2 is bolstered by the course of performance between the parties.  *See KN Energy, Inc.* v. *Great W. Sugar Co.*, 698 P.2d 769, 779 (Colo. 1985) ("The parties' course of performance following execution of the contract is also relevant to the interpretation of the agreement….  [A] course of performance may explain but not contradict the express terms of the writing."). Despite the long period of negotiations from December 2008 to January 2010, MemoryTen proffers no evidence to suggest that at any point during this period it understood the negotiations to have triggered its right to acquire the Distribution Business.  Rather, the email exchange cited by MemoryTen involves the LV Defendants "engag[ing] potential buyers" and "approaching MemoryTen and For All Memory … to determine potential interest."  (Jacobs Decl. Ex. A).  No evidence put forward speaks to a formal offer being made or proposed during this period.[9]

---

[9]     MemoryTen states in its Local Rule 56.1 Statement that "the LV Defendants were serious about selling the memory component division of Silicon, thus triggering LV's contractual obligations under [Paragraph] 8.4 of the Subscription Agreement."  (Pl. 56.1 ¶ 26).  While the Court accepts for the purposes of this motion the factual statement that "the LV Defendants were serious about selling the memory component division of Silicon," it rejects the statement that the contractual obligations were so triggered, as it is a legal conclusion inappropriate for inclusion in a statement of undisputed facts, and one not supported by citation to the record.  (*See id.* (citing Hrafnkelsdottir Dep. 156-60 (Plaintiff's counsel urging Lara Hrafnkelsdottir to state that the contractual obligations were triggered, and Hrafnkelsdottir stating that they were not))).  The Court finds that such "[m]ere conclusory allegations cannot by themselves create a genuine issue of material fact where none would otherwise exist."  *Hicks*, 593 F.3d at 166 (internal quotation marks and alteration omitted).

MemoryTen's next argument is that Silicon "propose[d] to offer the Memory Component Distribution Business … for sale or transfer in a transaction" when it sent its April 28, 2011 letter to the LV Defendants acknowledging its default and conveying peaceful possession. (*See* Pl. SJ Opp. 15-16; Hrafnkelsdottir Decl. Ex. B (peaceful possession letter)). Again, such an acknowledgment of default and declination to challenge a debtor's seizure of collateral does not constitute the sort of contractual offer contemplated by the language of Paragraph 8.2.

MemoryTen then invites the Court to step through the looking glass and conclude that when the LV Defendants offered Silicon for sale, it was actually Silicon offering itself for sale, because the LV Defendants were operating as the agent or alter ego of Silicon. (Pl. SJ Opp. 17-20). MemoryTen's alter-ego theory fails because there is no liability to impute: the LV Defendants may well have acted as Silicon's puppeteer (a finding the Court need not make), but as the Court has concluded that Silicon did not itself violate the Subscription Agreement, there is no liability to impute to the LV Defendants. MemoryTen then seeks to establish the necessary liability by arguing that when the LV Defendants offered Silicon up for sale, they did so as the agents of Silicon, thus making Silicon liable, which liability in turn can be imputed to the LV Defendants. This dizzying argument falls apart, however, because Silicon's letter acknowledging default and granting peaceful possession cannot conceivably form the basis of an agency relationship. Under Colorado law, "[a]gency is the fiduciary relation which results from the manifestation of

23

consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Stortroen* v. *Beneficial Fin. Co. of Colo.*, 736 P.2d 391, 395 (Colo. 1987) (quoting Restatement (Second) of Agency § 1(1) (1957)). Needless to say, granting the LV Defendants the right to dispose of Silicon's assets "in their best discretion" and "in such manner and in such order as the Secured Parties may determine in their sole and absolute discretion" does not suggest that the LV Defendants acted subject to Silicon's control.

Finally, MemoryTen claims "entitle[ment] to a declaration that [the LV Defendants] waived [their] rights under such loan documents in favor of Plaintiff's contractual rights under the Subscription Agreement." (Compl. ¶ 75). While the Court "may declare the rights and other legal relations of any interested party seeking such declaration," 28 U.S.C. § 2201, it is clear from the preceding discussion that the LV Defendants did not waive their rights, and thus that no declaratory relief (in favor of Plaintiff, at least) is appropriate. Accordingly, summary judgment is granted as to all of Plaintiff MemoryTen's claims against the LV Defendants.

## B. WayTech's Motion to Dismiss Is Granted

### 1. Applicable Law

When considering a motion to dismiss for failure to state a claim, a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98,

24

104 (2d Cir. 2011) (internal quotation marks omitted); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009).  A plaintiff is entitled to relief if it alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiff's] claims across the line from conceivable to plausible.'" (quoting *Twombly*, 550 U.S. at 570)).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).  "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).  "[A] plaintiff's *reliance* on the terms and effects of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or

possession is not enough." *Id.* (emphasis in original).  Here, MemoryTen's Complaint does not attach any exhibits, but MemoryTen relies upon and thus incorporates by reference the Loan Documents between Silicon and the LV Defendants as well as the Subscription Agreement between and among MemoryTen, Silicon, and the LV Defendants.

## 2. Plaintiff's Claims Against WayTech Fail

Plaintiff's Complaint states claims against Defendant WayTech for unjust enrichment, injunctive relief, and alter-ego liability.  Each of these claims fails as a matter of law.

"In Colorado, a plaintiff seeking recovery for unjust enrichment must prove: [i] at plaintiff's expense [ii] defendant received a benefit [iii] under circumstances that would make it unjust for defendant to retain the benefit without paying." *Salzman* v. *Bachrach*, 996 P.2d 1263, 1265-66 (Colo. 2000). Here, too, MemoryTen's arguments on the first and third prongs of the test depend on the Court accepting its interpretation of the Subscription Agreement; if MemoryTen's contractual rights were not violated, then any benefit gained by WayTech did not come at MemoryTen's expense, and it would not be unjust for WayTech to retain the benefit.  Because the Court has found that the unambiguous language of the contract disables MemoryTen's right to acquire in the event of an Article 9 foreclosure (*see supra* at Discussion A.2.a), MemoryTen's rights have not been violated.  Accordingly, the claim for unjust enrichment must fail.

A plaintiff seeking a permanent injunction must demonstrate:

26

> [i] that it has suffered an irreparable injury; [ii] that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; [iii] that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and [iv] that the public interest would not be disserved by a permanent injunction.

*eBay Inc.* v. *MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  Even if the damages claimed by MemoryTen were the sort of noneconomic damages for which an injunction is generally reserved — a questionable proposition, *see Marblegate Asset Mgmt.* v. *Educ. Mgmt. Corp.*, No. 14 Civ. 8584 (KPF), 2014 WL 7399041, at *12 (S.D.N.Y. Dec. 30, 2014) ("It is settled law that when an injury is compensable through money damages there is no irreparable harm." (internal citation and alteration omitted)) — the absence of any breach of MemoryTen's contractual rights defeats its claim of any injury, let alone an irreparable one.  Accordingly, Plaintiff cannot obtain injunctive relief.

Plaintiff's final claim against WayTech is that it operates as the alter ego of Silicon.  Although MemoryTen does not elaborate, presumably under this theory it seeks to incorporate all its claims against Silicon (namely, breach of contract, unfair competition, and declaratory relief) against WayTech.  Even assuming that Silicon operates as the alter ego of WayTech, or vice versa, the claims for breach of contract and declaratory relief fail because, as discussed at length, MemoryTen's contractual rights have not been violated.  Incorporating Plaintiff's claim of unfair competition against Silicon, the Complaint alleges only that "[t]he acts and conduct of [the LV Defendants] and Defendant Silicon

as alleged above constitute unfair competition in Colorado at common law."
(Compl. ¶ 63).

Colorado has recognized the common law tort of unfair competition,
citing for the existence of the cause of action *International News Service* v.
*Associated Press*, 248 U.S. 215 (1918), and for its elements *KMLA Broadcasting
Corp.* v. *Twentieth Century Cigarette Vendors Corp.*, 264 F. Supp. 35, 44 (C.D.
Cal. 1967) ("Under *INS* unfair competition is found to exist when the acts of a
defendant amount to interference and diversion of profit at the point where
plaintiff's profit is to be made."). *See Am. Television & Commc'ns Corp.* v.
*Manning*, 651 P.2d 440, 444 (Colo. App. 1982). Though this cause of action is
exceedingly broad, it unquestionably requires the identification of a wrong done
to the plaintiff — the deprivation of some profit to which it is entitled. The
Court in *International News Service* characterized the wrong done in that case
as such:

> Stripped of all disguises, the process amounts to an
> unauthorized interference with the normal operation of
> complainant's legitimate business precisely at the point
> where the profit is to be reaped, in order to divert a
> material portion of the profit from those who have
> earned it to those who have not; with special advantage
> to defendant in the competition because of the fact that
> it is not burdened with any part of the expense of
> gathering the news. The transaction speaks for itself
> and a court of equity ought not to hesitate long in
> characterizing it as unfair competition in business.

248 U.S. at 240. MemoryTen sees the parallel plainly: it invested in Silicon in
order to acquire a right to purchase it or its Distribution Business, and at just
the point where profit was to be reaped from the investment, WayTech

purchased Silicon instead (or, under the alter ego theory, Silicon was sold to WayTech instead).  However, MemoryTen's claims fail once again on the grounds that there has been no violation of its contractual rights.  Because MemoryTen did not, in fact, maintain a right to acquire Silicon or its Distribution Business after Silicon's assets were seized by the LV Defendants, it had not earned any right to acquire such business that was usurped by WayTech.  The LV Defendants owned Silicon free and clear following their foreclosure, and its ensuing sale to the highest bidder is the fairest sort of competition.

### 3.  Plaintiff's Request to Amend Its Pleadings Is Denied

Finally, MemoryTen asks that, if the Court finds its pleadings deficient, it be given leave to amend its pleadings.  (Pl. MTD Opp. 15).  "When determining whether to grant leave to amend, district courts consider: (i) whether the party seeking the amendment has unduly delayed; (ii) whether that party is acting in good faith; (iii) whether the opposing party will be prejudiced; and (iv) whether the amendment will be futile."  *Gorman* v. *Covidien Sales, LLC*, No. 13 Civ. 6486 (KPF), 2014 WL 7404071, at *2 (S.D.N.Y. Dec. 31, 2014) (citing *Foman* v. *Davis*, 371 U.S. 178, 182 (1962)).[10]  Due to the unusually tortuous history of this litigation, MemoryTen's desire for a third amendment of its complaint (nearly three years after the filing of its original complaint) might be neither unduly

---

[10]    Because MemoryTen's request to amend its pleadings fails on the grounds of futility, the Court need not consider whether the District of Colorado's previous scheduling order (*see* Dkt. #43) means that the stricter "good cause" standard of Federal Rule of Civil Procedure 16(b) should apply.  *See Gorman*, 2014 WL 7404071, at *2.

delayed nor in bad faith, coming as it does on the heels of a motion to dismiss. Yet these factors are insufficient to overcome the fact that amendment would be futile.  *See Hunt* v. *Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 728 (2d Cir. 1998) (noting that it remains "proper to deny leave to replead where there is no merit in the proposed amendments or amendment would be futile").

Here, Plaintiff's claims arise entirely from its interpretation of Paragraphs 8.1 and 8.2 of the Subscription Agreement — an interpretation the Court has conclusively rejected.  Plaintiff's claims do not fail due to a simple misstatement or technical defect.  *Contra Gormin* v. *Hubregsen*, No. 08 Civ. 7674 (PGG), 2009 WL 35020, at *1 (S.D.N.Y. Jan. 6, 2009).  Rather, Plaintiff's claims fail because "the underlying facts or circumstances relied upon" by MemoryTen are not "a proper subject of relief."  *Foman*, 371 U.S. at 182. Accordingly, Plaintiff's request for leave to amend is denied as futile.

## CONCLUSION

For the reasons set forth in this Opinion, the LV Defendants' motion for summary judgment is GRANTED, and Defendant WayTech's motion to dismiss is GRANTED.  Plaintiff MemoryTen's claims against these Defendants are DISMISSED WITH PREJUDICE.

Neither Silicon (Silicon Mountain Holdings, Inc.) nor SMM (Silicon Mountain Memory, LLC) has appeared in this litigation or moved for summary judgment or to dismiss the case.  However, it is the Court's understanding both that these companies have ceased to have independent legal existence and that

the reasoning of this Opinion necessarily disposes of whatever claims might lie against these Defendants.  Accordingly, the Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case; provided, however, that within thirty (30) days of the date of this Opinion, Plaintiff MemoryTen may submit to the Court a letter explaining why it believes that a cause of action set out in the Complaint remains against Silicon or SMM.  This Opinion shall be deemed a final dismissal of the claims against Silicon and SMM in thirty (30) days absent such a request.

      SO ORDERED.

Dated:      March 16, 2015
             New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge